**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————— )
H. ALEXANDER MANUEL,                             )
                                                 )
                          Plaintiff,             )
                                                 )
           v.                                    )    Civil Action No. 07-2127 (RBW)
                                                 )
                                                 )
JOHN E. POTTER,                                  )
Postmaster General,                              )
U.S. Postal Service                              )
                                                 )
                          Defendant.             )
———————————————————————— )

## MEMORANDUM OPINION

Plaintiff H. Alexander ("Alex") Manuel brings this action against the Postmaster General of the United States Postal Service ("Postal Service") in his official capacity, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2006) ("Title VII"), Complaint ("Compl.") ¶¶ 1, 9-12, on the basis that the Postal Service, an agency of the United States government and his employer, engaged in discriminatory employment practices against him based on his race (African-American), id. ¶¶ 9-10, and national origin (Japanese), id., retaliated against him after he engaged in statutorily protected activity, id. ¶¶ 11-12, and constructively discharged him from his position, id. ¶ 9. This matter is currently before the Court on the defendant's Motion For Summary Judgment ("Def.'s Mot."), which the plaintiff opposes, Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"). After carefully considering the parties' pleadings, the defendant's motion and the plaintiff's

opposition, and all memoranda of law and exhibits submitted with these filings,[1] the Court

concludes the defendant is entitled to summary judgment on all of the plaintiff's claims.

## I. BACKGROUND

Viewing the evidence in the light most favorable to the plaintiff, the facts are as follows.

The plaintiff is a former employee of the Employment and Labor Law Section (the "ELL

Section"), Law Department, of the Postal Service.  Pl.'s Opp'n, Exhibit ("Ex.") 16 (Declaration

of H. Alexander Manuel) ("Manuel Decl.") ¶ 6.  The plaintiff, an African-American male of

Japanese ancestry, Compl. ¶ 4, was an attorney with the Postal Service for five years, beginning

in 2002 and ending with his resignation in March of 2007.  Pl.'s Opp'n, Ex. 16 (Manuel Decl.)

¶¶ 1, 5.  The plaintiff initially accepted a contract position with the Postal Service's Capital

Metro field office in Washington, D.C., before being offered a career position at the ELL Section

at the Postal Service's Headquarters.  Id. ¶¶ 5-6.  The ELL Section is headed by a Managing

Counsel, who oversees its three units, each managed by a Chief Counsel.  Def.'s Mem., Ex. E

(ELL Section General Information).  During the time period covered in this complaint, the

plaintiff's first-line supervisor was Stephan Boardman, Chief Counsel of the Labor Relations

unit, and his second-line supervisor was Eric Scharf, Managing Counsel of the ELL Section.

Def.'s Stmt. ¶¶ 2-3.[2]  As a member of the ELL Section, the plaintiff worked in the labor relations

unit, representing the USPS in negotiations, arbitrations, and federal court litigation.  Pl.'s

Opp'n, Ex.1 (Deposition of Stephan Boardman) ("Boardman Dep.") at 80.  Before commencing

---

[1]  The Court also considered the following documents that were submitted in connection with this motion:  the defendant's Memorandum Of Points And Authorities In Support Of Its Motion For Summary Judgment ("Def.'s Mem."); the defendant's Statement Of Material Facts Not In Genuine Dispute ("Def.'s Stmt."); the Plaintiff's Opposition To Defendant's Motion For Summary Judgment ("Pl.'s Opp'n"); the Plaintiff's Statement Of Facts In Genuine Dispute ("Pl.'s Stmt."); and the defendant's Reply In Support Of Its Motion For Summary Judgment ("Def.'s Reply").

[2]  The Court cites to the defendant's Statement of Facts Not in Genuine Dispute only where explicitly conceded or uncontested by the plaintiff.  See Pl.'s Stmt. at 1.

his employment at the Postal Service, the plaintiff worked as an attorney for over twenty years, practicing in both the public and private sectors.  Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶¶ 2-3, 5.

The incident precipitating the plaintiff's engagement in protected activity occurred in approximately early December, 2004.[3]  At that time, the plaintiff was preparing for an arbitration hearing with labor relations Technical Assistant Marty Welles.  Pl.'s Opp'n, Ex. 4 (Deposition of Herman A. Manuel) ("Manuel Dep.") at 6-7.  The plaintiff and the other Postal Service attorneys assigned to work on the arbitration instructed Mr. Welles to deliver documents to a witness residing in Prince George's County, Maryland.  Def.'s Mem. (Deposition of Courtney Wheeler) at 28.  Welles refused to make the delivery, and when pressed for an explanation, purportedly stated, "I'm not going to go into that neighborhood with those people."  Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 7.[4]  Further, Mr. Welles commented that it would be more appropriate for the plaintiff to go to the neighborhood to make the delivery.  Id.  Feeling unpleasant about the remark and that it was "understood by everyone" to be inappropriate, id. at 11, he reported the incident to Mr. Boardman the following morning, Def.'s Stmt. ¶ 6.  According to the plaintiff, he also told Mr. Boardman at that time about a prior incident in which Mr. Welles allegedly displayed "Black Sambo" cartoon images at a Postal Service slideshow presentation at an earlier

---

[3] The plaintiff disputes this date, submitting that February 2005 is the proper date.  See Pl.'s Opp'n at 2 n.2 (referencing the plaintiff's prior testimony).  However, in his deposition, the plaintiff testified that although he was "not real certain about that date," Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 6, he remembers that the incident occurred prior to a specific arbitration hearing, which the record indicates began on December 7, 2004.  Def.'s Mem., Ex. F (Arbitrator's Award) at 1.  Although the Court must construe the facts in the light most favorable to the plaintiff, because the plaintiff's only support for his assertion that the incident occurred in February 2005 is that he remembers that "it was getting darker," Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 9, and that spring 2005 "was when I started having the very different treatment from my supervisors" id., the Court must conclude, based on the plaintiff's own deposition testimony, that the incident took place at the latest in December 2004, prior to the arbitration hearing.

[4]  Although the parties have not stipulated that Mr. Welles used the exact words offered by the plaintiff, the defendant does not dispute that Mr. Welles made inappropriate comments to the plaintiff and that the plaintiff's reporting of the statement constitutes statutorily protected activity under Title VII.  See Def.'s Stmt. ¶¶ 5-6; Def.'s Mem. at 4-5.

year's conference.[5]  Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 18-20.  After reporting the incident, the

plaintiff attended two meetings with Messrs. Boardman, Scharf, and Kevin Rachel, Mr. Welles'

supervisor.  Def.'s Stmt. ¶ 7.  During the second meeting, the three supervisors "stated that Mr.

Welles' statement was 'improper' and 'regrettable,' and asked [the] [p]laintiff how he wanted to

proceed."  Id. ¶ 8.  The plaintiff responded "that it 'was not [his] purpose to bring a claim against

anyone, or anything along those lines,'" but only to ensure "that Mr. Welles 'did his job . . . and

that [a similar incident did not] happen again,'" id. (citations omitted).  Thereafter, Mr. Welles

was called into the meeting to apologize to the plaintiff, which he did, Def.'s Stmt. ¶ 9, the two

shook hands, and the plaintiff "told [Mr. Welles that he] accepted his apology" and indicated that

he did not intend to pursue further action against Welles or the Postal Service, Pl.'s Opp'n, Ex. 4

(Manuel Dep.) at 27-28.  The plaintiff believed that his supervisors "initially" handled the matter

well and thanked them, id. at 30, however, no written record was made to document the incident

or the oral reprimand Mr. Welles received.  Pl.'s Opp'n, Ex. 1 (Boardman Dep.) at 161.

After reporting the incident (the "Welles incident"), according to the plaintiff, he suffered

detrimental career consequences.  Compl. ¶ 7.  To begin with, the plaintiff claims that after the

Welles incident, he never again received a bonus while other attorneys in his department did,

Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 125, receiving his last cash award on February 4, 2005, for

his work on the Stone litigation.  Def.'s Stmt. ¶ 50.

In addition, the plaintiff claims that he received fewer training opportunities than his

colleagues.  Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 110.  Specifically, during the 2005-2006 rating

period, the plaintiff received only 33.25 hours of training, while four other attorneys under Mr.

---

[5]  The plaintiff estimates that this incident occurred in 2003 or 2004.  Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 19.
However, Mr. Boardman denies that the plaintiff ever reported the event to him.  Id., Ex. 1 (Boardman Dep.) at 150-
51.

Boardman's supervision received 35.25, 56.75, 55.25, and 62.25 hours of training respectively.[6] Def.'s Stmt. ¶¶ 20, 23. The plaintiff stated that his "colleagues attended seminars and legal events that [he] was never presented as an opportunity," Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 110, but concedes that he was offered the opportunity to attend the National Academy of Arbitrators 2006 Annual Meeting, a "valuable" training event, but declined the invitation because of scheduling conflicts, id. at 122-23.

Further, the plaintiff contends that after reporting the Welles incident, his supervisors expressed concern about the quality of his "writing." Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶ 16. For example, in November 2005 the plaintiff was assigned to conduct the arbitration hearing and draft the post-hearing brief in the "Sunday premium" remedy case. Def.'s Stmt. ¶ 37. On November 14, 2005 Mr. Boardman reviewed the plaintiff's briefing sheet and assessed it as "below par." Pl.'s Opp'n, Ex. 8 (Boardman Email Nov. 15, 2005) at 1. According to the plaintiff, Mr. Boardman's review focused on style, formatting, and subjective criteria. Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 155-56. After the plaintiff submitted his first draft of the legal brief Mr. Boardman reviewed it critically, noting perceived deficiencies in "substan[ce], style, and appearance," and concluding that "I recommend you buy a good book on writing/composition and take a writing course." Pl.'s Opp'n, Ex. 8 (Boardman Email Feb. 24, 2006) at 1, 3. Mr. Boardman ultimately made "substantial" revisions to the brief before filing it with the arbitrator. Def.'s Stmt. ¶ 62.

In a similar vein, the plaintiff asserts that although he disagreed with Mr. Boardman's criticism of his writing, he agreed to take "an on-line American Law Institute course on writing" at his own expense. Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶¶ 15-16. Mr. Boardman believed that

---

[6] The USPS "Law Department requires that its employees receive only 20 hours of training per year." Def.'s Stmt. ¶ 21.

the two-hour online course was insufficient and maintains that the Postal Service would have

paid for an upper level writing course if the plaintiff had sought the necessary approval.  See

Def.'s Mem. (Affidavit of Stephan Boardman) ¶ 25; id., Ex. O (Scharf Email Jan. 8, 2007)

(approving payment for a District of Columbia Bar advanced writing course).

      The plaintiff also contends that after reporting the Welles incident, he was not promoted

"to the Career Executive Service."  Compl. ¶ 7.  Specifically, in October 2005, the plaintiff

submitted an application for placement on the Postal Service's Succession Planning List, the

process by which employees are considered for Postal Career Executive Service positions.

Def.'s Stmt. ¶ 14.  As Managing Counsel, Mr. Scharf was charged with submitting a written

evaluation of the plaintiff indicating whether he supported the plaintiff's candidacy for several

management positions.  Def.'s Stmt. ¶ 15; Def.'s Mem., Ex. J (Manuel's Postal Career Executive

Service Application) at 3.  Although the plaintiff claims that Messrs. Scharf and Boardman

initially gave him a "positive" evaluation and Mr. Boardman communicated to him that that he

would support his application for a promotion, Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶ 7, Mr.

Scharf did not make the recommendation.  Def.'s Mem., Ex. J (Manuel's Postal Career

Executive Service Application) at 3.  In his evaluation, Mr. Scharf wrote that while the plaintiff

"is a well-liked, hard-working attorney," he "had not demonstrate[d] that his writing and

analytical abilities [were] sufficient to enable him to lead other attorneys."  Id.  Subsequently, the

Postal Service's management committee declined to place the plaintiff on the Succession

Planning List, and notified him of its decision in April 2006.  Def.'s Stmt. ¶ 18.

      Additionally, the plaintiff claims that he was denied or removed from certain assignments

in response to him reporting the Welles incident.  Compl. ¶ 7.  The plaintiff lists several

assignments he believes he was wrongfully deprived, noting in particular not being assigned the

labor contract negotiations for the Information Technology and Accounting Service Centers. Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶¶ 20-21.  According to the plaintiff, although he "knew far more about that [particular] bargaining unit than any other Postal Service attorney" because of his prior experience with the unit, id., Mr. Boardman assigned the labor negotiations to another in March 2006, Def.'s Stmt. ¶ 43, even though she "had no labor negotiations experience or connection to the [Information Technology and Accounting Service Center's] bargaining unit," Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶ 21, while Mr. Boardman explains that he chose the other attorney for the assignment because he had been "impressed with her work," and "did not believe that she would require the same level of oversight [as the plaintiff would require]."  Def.'s Mem. (Declaration of Stephan Boardman Under Seal) ¶ 23.  Rather, when those negotiations were being conducted, Mr. Boardman assigned the plaintiff to work on two other negotiations.  Def.'s Stmt. ¶ 43.

In 2004, the plaintiff was assigned as the lead Postal Service attorney on the <u>Bland</u> litigation, a Fair Labor Standards Act class action proceeding that was being litigated in the Court of Federal Claims.  Def.'s Mem. (Declaration of Kevin A. Calamoneri) ("Calamoneri Decl.") ¶¶ 3, 6.  Because the <u>Bland</u> litigation was a putative class action, the plaintiff's direct supervisor in that matter was Kevin Calamoneri, Chief Counsel of the National Employment Litigation Unit ("NEL Unit").  Id. (Calamoneri Decl.) ¶¶ 4-6.  In 2006 <u>Bland</u> was scheduled for alternative dispute resolution ("ADR"),  Def.'s Mem. (Declaration of David B. Ellis) ("Ellis Decl.") ¶ 6,  and on October 19, 2006, while preparing for those proceedings, Mr. Boardman assigned the plaintiff to second chair the "article 32" arbitration scheduled for early 2007 and encouraged him to begin working on the case immediately because the arbitration was "important" and "involve[d] a lot of money."  Def.'s Mem., Ex. P (Boardman Email Oct. 19,

2006).  The following day, the plaintiff sent Mr. Boardman an email detailing his work

assignments and current "schedule conflicts" that could interfere with his ability to perform the

new assignment.  Def.'s Stmt. ¶ 34.  On October 23, 2006, the plaintiff sent another email to Mr.

Boardman, stating,

> In addition to the projects [identified in the October 20, 2006 email], I am
> working on the Bland ADR which involves work on a brief due to DOJ in 2
> weeks, some spreadsheet review and the actual sessions that start in mid-
> November. I don't see how it will be possible to put in meaningful time on the
> [article 32] arbitration and get this other work done also.  Can [we] get a
> postponement [with respect to the article 32 arbitration]? Do you want to talk to
> Eric [Scharf] or Dave Ellis about my working on the Bland ADR? Please let me
> know.

Id. (citing Def.'s Mem., Ex. P (Manuel Email Oct. 23, 2006) at 443).  Mr. Boardman forwarded

the email to Mr. Scharf, id. ¶ 35, who met with the plaintiff's current supervisor, Dave Ellis,

Def.'s Mem. (Ellis Decl.) ¶ 6.  Mr. Ellis "suggested to Eric Scharf that [the plaintiff] could be

relieved from his assignment on the Bland case so that he could concentrate on his Labor Law

workload."  Id.  Mr. Ellis felt that Bland, once scheduled for ADR, could be adequately handled

by the first chair Department of Justice attorney and Postal Service attorney Dennis Syzbala,

who had assisted the plaintiff in the preparation of that case since 2005.  Id.  Accordingly, Mr.

Scharf authorized the plaintiff's removal from Bland, which the plaintiff insists he never desired.

Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶ 13.

Following his removal from the Bland litigation, in November 2006, the plaintiff

received his annual performance appraisal for the 2005-2006 rating period.  Def.'s Stmt. ¶ 54.

The evaluation was drafted by Mr. Boardman, approved by Mr. Scharf, and contained both

numeric and narrative "ratings."  Id. ¶¶ 54, 56.  In preparation for this review, Mr. Boardman

requested that the plaintiff send him all of his written work products, which he passed along to

Mr. Scharf, a practice not demanded "to this extent" with respect to other Postal Service

attorneys.  Pl.'s Opp'n, Ex. 2 (Deposition of Eric J. Scharf) at 81-83.  Mr. Boardman rated the

plaintiff as a "Contributor" and assigned him a numeric rating of 4.[7]  Def.'s Stmt. ¶ 54.  The

other four attorneys under Mr. Boardman's supervision were also rated as "Contributors," but

each was assigned a "6."[8]  Id. ¶ 55.  In contrast, in rating period 2004-2005, Mr. Boardman rated

the plaintiff a "Contributor" and assigned him a "6."  Id. ¶ 69.[9]  The 2005-2006 evaluation also

contained several critical comments, including the observation that, "though Alex tries to be

responsive to management and works hard, he is slow to develop a sound theory of the case."

Def.'s Mem., Ex. S (Manuel Evaluation 2005-2006) at 178.  Further, Boardman stated, "Alex

has had difficulty producing an adequate number of satisfactory work products. Part of the

problem is timeliness, another is writing, and the final is analytical—all need improvement."  Id.

at 179.  Mr. Boardman also echoed his criticism of the plaintiff's work on the "Sunday premium"

brief and highlighted two research memoranda, the "union assignment" and "external law"

assignments, that were "seriously tardy (without advance notice)," noting one was "marginally

satisfactory."  Id.  To improve the plaintiff's written products, Mr. Boardman suggested that

"Alex and I will go over a basic book about the rules of grammar and composition one chapter

per week until finished."  Id. at 179.  Despite his conclusion that the plaintiff had a "positive

work ethic," Mr. Boardman also concluded that his deficiencies warranted placement on a

mandatory performance improvement plan ("PI Plan").  Id. at 181.

---

[7]  The 2005-2006 Postal Service ratings included the following rankings—"Non-contributor"; "Contributor"; "High
Contributor"; and "Exceptional Contributor"—and the numeric rating ranged from 1-15.  Def.'s Mem., Ex. T
(Manuel Evaluation 2004-2005) at 177.

[8]  In 2006, a rating of 4 resulted in a 2.5% salary increase and a rating of 6 resulted in a 3.5% increase.  Def.'s Mem.
(Declaration of Eric J. Scharf Under Seal) ¶ 28 n.1.

[9]  In the 2004-2005 evaluation, Mr. Boardman wrote, "[the plaintiff] needs . . . to improve his organizational skills,
and . . . to improve his written work products."  Id. ¶ 70.

The PI Plan crafted by Mr. Boardman directed the plaintiff to "prepare a comprehensive memorandum about the [article 32 arbitration]" that must "not require more than minor editing." Def.'s Mem., Ex. GG (Manuel's PI Plan) at 171. The PI Plan was not placed in the plaintiff's official personnel file, but, Mr. Boardman informed the plaintiff that he should consider alternative employment if he was not able to complete the PI Plan successfully. Pl.'s Opp'n, Ex. 1 (Boardman Dep.) at 177-78. Mr. Boardman suggested that the plaintiff consider moving back to the Postal Service's Capital Metro field office, but later discovered that no vacancies were available. Id. at 174-75. Shortly thereafter, Messrs. Boardman and Scharf offered the plaintiff a position with the Postal Service's Corporate Law section, which the plaintiff declined, characterizing the offer as "a ruse." Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 196-97.

Subsequently, the plaintiff began working on the PI Plan assignment but requested and was granted several extensions. Def.'s Stmt. ¶ 78. Ultimately, the PI Plan assignment was never completed before the plaintiff's employment at the Postal Service ended because he maintains that he was not given the requisite materials needed to prepare the memorandum required by the PI Plan. Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 183-87.

On November 27, 2006, the plaintiff informed Messrs. Boardman and Scharf of his intention to seek Equal Employment Opportunity ("EEO") counseling, Def.'s Mem., Ex. G (Manuel Email Nov. 27, 2006) at 1, and on March 7, 2007, the plaintiff filed the EEO complaint that gave rise to this suit. Def.'s Stmt. ¶ 13. Thereafter, on March 16, 2007, the plaintiff informed his supervisors that he was resigning from the Postal Service to accept an administrative law judge position with the Department of Housing and Urban Development. Def.'s Mem., Ex. D (Manuel Email March 16, 2007); Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 218.

The plaintiff received a final agency decision on November 8, 2007, Compl. ¶ 2, then filed this action in this Court on November 26, 2007.

The plaintiff has pled two counts of discrimination under Title VII:  (1) discrimination and constructive discharge based on race, Compl. ¶ 9, and (2) retaliation and constructive discharge because of his earlier participation in protected EEO activity, id. ¶ 11.  As a result of this allegedly discriminatory and retaliatory activity, the plaintiff contends that he "has suffered and continues to suffer severe curtailment of his career opportunities, loss of pay, personal and professional humiliation, and emotional pain and suffering."  Id. ¶¶ 10, 12.

The defendant has filed the motion currently before the Court seeking summary judgment pursuant to Federal Rule of Civil Procedure 56.  Def.'s Mot. at 1.  Specifically, the defendant contends that he is entitled to the relief being requested because:  (1) with respect to several of the discrete employment actions that support the plaintiff's claims, he has failed to timely exhaust his administrative remedies, Def.'s Mem. at 27-28; (2) several of the actions about which the plaintiff has complained are not "adverse under the governing law," id. at 28-31, 40-42; (3) "[the] defendant has asserted legitimate, nondiscriminatory reasons for the actions upon which they are based," and therefore "no reasonable jury could conclude that [the] [d]efendant discriminated [or retaliated] against [the] [p]laintiff when it engaged in the actions," id. at 28, 31-39; and (4) the plaintiff's claim of constructive discharge fails because "none of [the p]laintiff's claims of race discrimination or retaliation is viable" and "he cannot show that his work environment was so intolerable that a reasonable employee in his position would have felt compelled to resign," id. at 43-45.

In opposition to the defendant's motion, the plaintiff contends that summary judgment is improper because:  (1) "targeted actions" and "a pattern of antagonism" directed at the plaintiff

constitute adverse actions sufficient under the governing law, Pl.'s Opp'n at 15; (2) the

defendant's proffered legitimate, nondiscriminatory reasons are pretextual, id. at 21; (3) the

defendant's exhaustion of remedies argument "lacks merit," because proof of prior

discriminatory actions may be admitted as background evidence, id. at 37-38; and (4) the

plaintiff's constructive discharge claim is viable because he can "establish he was a victim of

discrimination or retaliation" and his "situation falls squarely under the definition of constructive

discharge," id. at 39-40.

## II. STANDARD OF REVIEW

To grant a motion for summary judgment, the Court must find that "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  When ruling on a motion for summary judgment, the Court must view the

evidence in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889,

895 (D.C. Cir. 2006), and must also draw "all justifiable inferences" in the non-moving party's

favor and accept the non-moving party's evidence as true.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 255 (1986).  However, the non-moving party cannot rely on "mere allegations or

denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at

248) (internal quotation marks omitted), but "must set forth specific facts showing that there is a

genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986).  In addition, the non-moving party cannot rely upon inadmissible

evidence to survive summary judgment; rather, the non-moving party must rely on evidence that

would arguably be admissible at trial.  Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007)

(finding that "[t]o survive summary judgment the non-moving party must 'produce evidence . . .

capable of being converted into admissible evidence'" and that "sheer hearsay . . . counts for nothing" (internal citations omitted)).  However, the party moving for summary judgment bears the burden of establishing the absence of evidence that supports the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Finally, because of the difficulty of establishing discriminatory intent, "an added measure of rigor, or caution, is appropriate in applying this standard to motions for summary judgment in employment discrimination cases." Aka v. Washington Hosp. Ctr., 116 F.3d 876, 879-80 (D.C. Cir. 1997) (internal quotation marks omitted), rev'd on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

### III. LEGAL ANALYSIS

A.  Exhaustion of Administrative Remedies

  The exhaustion of administrative remedies is a prerequisite to the awarding of judicial relief under Title VII.  42 § U.S.C. 2000e-16(c); Brown v. Gen. Servs. Admin., 425 U.S. 820, 832-33 (1976); Bayer v. U.S. Dep't of Treasury, 956 F.2d 330, 332 (D.C. Cir. 1992).  An aggrieved plaintiff must initiate administrative proceedings by contacting an EEO counselor within forty-five days of the allegedly discriminatory action.  29 C.F.R. § 1614.105(a)(1); see Steele v. Schafer, 535 F.3d 689, 693 (D.C. Cir. 2008).  This forty-five day time limit is not jurisdictional, but operates as a statute of limitations defense.  See Jarrell v. U.S. Postal Serv., 753 F.2d 1088, 1091 (D.C. Cir. 1985) ("[A] timely administrative charge is a prerequisite to initiation of a Title VII action in the District Court . . . subject to waiver, estoppel, and equitable tolling.'" (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)).  As an affirmative defense, the defendant bears the burden of proving that the plaintiff failed to properly exhaust his administrative remedies.  See Colbert v. Potter, 471 F.3d 158, 165 (D.C. Cir. 2006); Armstrong v. Reno, 172 F. Supp. 2d 11, 20 (D.D.C. 2001) (citing Bowden v. United States, 106

F.3d 433, 437-38 (D.C. Cir. 1997); Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985)).  Although

29 C.F.R. § 1614.105(a)(2) (2010) provides that the plaintiff may plead equitable considerations

as grounds for tolling the untimely contact with an EEO counselor, Steele, 535 F.3d at 693, this

Circuit has held that equitable tolling should only be granted in "extraordinary and carefully

circumscribed circumstances,"  Mondy v. Sec'y of the Army, 845 F.2d 1051, 1057 (D.C. Cir.

1988).

       Additionally, in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the

Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even

when they are related to acts alleged in timely filed charges," id. at 113.  However, such acts may

be used "as background evidence in support of a timely claim." id.; accord Halcomb v. Office of

Sergeant at Arms, 563 F. Supp. 2d 228, 242 (D.D.C. 2008) (finding that background evidence

cannot "independently provide the basis" for liability); Brownfield v. Bair, 541 F. Supp. 2d 35,

41 (D.D.C. 2008).

       The defendant argues that "it is undisputed that the plaintiff first contacted an agency

EEO counselor on November 27, 2006," Def.'s Reply at 2, and therefore, the plaintiff may not

pursue discrimination claims based upon discrete actions that occurred prior to October 13, 2006.

Id.  According to the defendant, the following claims being asserted by the plaintiff are

consequently barred on exhaustion grounds:

> [(1)] His non-selection as a potential successor for a [Postal Career
> Executive Position]---which he learned about 'in April 2006'; [(2)] his
> non-receipt of four assignments---since each of those assignments was
> given to one of his colleagues well before October 13, 2006 . . . ; [(3)] his
> non-receipt of cash awards prior to October 13, 2006 . . .; [(4)] and his
> alleged non-receipt of training opportunities prior to October 13, 2006.

Id.  (citations omitted).

The plaintiff does not challenge October 13, 2006 as the operative date governing the tolling of his claims.  See Pl.'s Opp'n at 37.  Instead, he argues that under Morgan, "[t]he pre-45 day actions of [the] Defendant's supervisory employees are properly before this Court as 'background evidence.'"  Id.  Further, the plaintiff contends that such evidence is admissible to show motive or intent of a tortfeasor, id. at 37-38, and therefore "[the] Defendant's exhaustion of remedies argument lacks any application here," id. at 38.

As the plaintiff has not challenged October 13, 2006 as the operative date for assessing the tolling of his claims, nor has offered a basis for invoking equitable tolling, the Court finds that each discrete act of discrimination alleged prior to that date is barred on exhaustion grounds and may not be considered as a basis for liability under Title VII.  Steele, 535 F.3d at 693.  However, consistent with Morgan, the Court may consider these events as background evidence.[10]  536 U.S. at 113.  Thus, the remaining acts properly before this Court are:

> (1) the plaintiff's alleged non-receipt of training opportunities subsequent to October 13, 2006; (2) the plaintiff's removal from the Bland case in late October 2006; (3) the plaintiff's non-receipt of cash awards subsequent to October 13, 2006; (4) [the] Plaintiff's receipt of a negative performance appraisal for the 2005/2006 rating period in November 2006; and (5) [the] Plaintiff's receipt of a PIP in November 2006.

Def.'s Reply at 2-3.

---

[10]  The Court, however, will not consider the plaintiff's non-receipt of several assignments prior to October 13, 2006 and his alleged removal from the Stone case in its analysis.  Although the plaintiff initially cited these incidents in his deposition, to which the government addressed in its Motion, he has not pursued these allegations in his Opposition.  "It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the government, a court may treat those arguments that the plaintiff failed to address as conceded."  Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C. 2003).  This prerogative derives from Local R. 7.1(b), which states:

> Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion.  If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded.

(emphasis added.)  "Courts have interpreted this local rule to apply to specific arguments within a memorandum opposing a motion."  United States v. Real Prop., 287 F. Supp. 2d 45, 61 (D.D.C. 2003).

B. The Components of the Plaintiff's Timely Disparate Treatment Claim

Title VII provides that "personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race . . . . " 42 U.S.C. § 2000e-16(a). Where, as here, there is no direct evidence of discrimination,[11] the Court assesses the plaintiff's claims under the framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, "the plaintiff must establish a prima facie case of discrimination" in the first instance, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000), which requires him to show that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination," Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002).  After making this showing, "the burden shifts to the defendant, who must 'articulate some legitimate, non-discriminatory reason' for the adverse action,'" Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting McDonnell Douglas, 411 U.S. at 802). However, assuming that the defendant can articulate a legitimate, non-discriminatory reason for its treatment of the plaintiff, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s]," Reeves, 530 U.S. at 142–43 (internal citation and quotation marks omitted), and the court must resolve only "the ultimate question of discrimination vel non." George v. Leavitt, 407 F.3d 405, 411-12 (D.C. Cir. 2005) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983)).

---

[11]  "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference. Such evidence includes any statement or written document showing a discriminatory motive on its face." Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) (internal quotation marks, citations, and alterations omitted). The plaintiff does not argue, nor could he, that the factual record in this case contains any such direct evidence of discrimination.

However, the District of Columbia Circuit has held that when considering a motion for summary judgment "[i]n a . . . disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not–and should not–decide whether the plaintiff actually made out a prima facie case" and must "resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?"  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  Although Brady moderates the impact of the plaintiff's prima facie case in conducting the disparate-treatment analysis, as the District of Columbia Circuit has since explained in Jones v. Bernanke, 557 F.3d 670 (D.C. Cir. 2009), the strength of the prima facie case, along with evidence of "pretext and any other" evidence of discrimination bears on the "determin[ation] whether [these several categories of evidence] 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer [discrimination]."  Id. at 679 (quoting Waterhouse v. District of Columbia, 298 F.3d 989, 992-93 (D.C. Cir. 2002)).

Finally, as a prerequisite to relief under Title VII, the plaintiff must have suffered an adverse employment action.  Brady, 520 F.3d at 493.  An adverse action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  As the District of Columbia Circuit has emphasized repeatedly, "not everything that makes an employee unhappy is an adverse action," id. (citation omitted), and therefore, there is no liability for "'[p]urely subjective inquiries,' such as dissatisfaction with

reassignment, public humiliation, or loss of reputation." Halcomb, 563 F. Supp. 2d at 239 (citing Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006)).

As an initial matter, the defendant has challenged several of the allegedly discriminatory acts complained of by the plaintiff as not sufficiently adverse under the governing law. Def.'s Mem. at 28-31. The defendant argues that under Title VII precedent, the following actions are not materially adverse: "(1) [the plaintiff's] alleged non-receipt of certain training opportunities; (2) his removal from the Bland case; (3) his non-receipt of the four assignments; and (4) his placement on the PI [Plan]," and that in his opposition, the plaintiff "does not attempt to argue that any of the above actions constitutes an adverse action sufficient to sustain a claim of discrimination." Def.'s Reply at 21 (citations omitted). The Court agrees that the plaintiff has not made this argument with respect to the challenged actions, and that in its view, none of the above referenced actions caused "a significant change in employment status" or "materially adverse consequences affecting the terms, conditions, or privileges of employment." Douglas, 559 F.3d at 552; see Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (placement on PI Plan not materially adverse when the placement had no effect on salary or grade); Lester v. Natsios, 290 F. Supp. 2d 11, 29 (D.D.C. 2003) (denial of training opportunity did not constitute adverse action where the denial had no significant effect on employment status or benefits); id. at 28 ("Changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if 'unaccompanied by a decrease in salary or work hour changes.'") (citation omitted).

Therefore, the only remaining actions about which the plaintiff complains that survive the defendant's exhaustion and adverse action challenges falling under his discrimination claim are: (1) his non-receipt of cash awards after October 13, 2006; and (2) his receipt of a negative

performance evaluation (and corresponding salary adjustment) on November 27, 2006.  The

Court is satisfied that because these two actions caused the plaintiff direct economic harm, they

constitute adverse employment actions.  See Douglas, 559 F.3d at 552-53 (holding that "the

denial of even a purely discretionary bonus can be actionable" and if a performance evaluation

"determines the bonus . . . then the employee may show the evaluation caused an objectively

tangible harm").  Accordingly, because the defendant has offered nondiscriminatory reasons for

its actions, under Brady, the Court will evaluate the totality of the plaintiff's rebuttal evidence on

the ultimate issue of discrimination vel non.

> **a.     Denial of Cash Awards**

The plaintiff asserts that the denial of cash awards following his reporting of the Welles

incident "evidences discrimination and pretext."  Pl.'s Opp'n at 30.  The defendant, on the other

hand, maintains that during this rating period, the plaintiff's work was "relatively weak

compared to those who received awards."  Def.'s Mem. at 37.  And the defendant notes that after

October 13, 2006, the "[p]laintiff has not identified any work that he did . . . for which he was

denied a cash award."  Def.'s Mem. at 13-14.  Although the plaintiff's allegations regarding the

Stone case in 2005 are barred on exhaustion grounds, the defendant adds that "the number and

size of the cash awards that [the p]laintiff received" in that year was commensurate with his

Postal Service colleagues.  See id. at 37; id. (Declaration of Margaret McMahon) at Ex. 1.

Finally, the defendant notes that Nicole Wynn, an African-American Postal Service attorney

(under Mr. Scharf's, but not Mr. Boardman's supervision), received three cash awards in 2005

and 2006, thus undermining the plaintiff's claim that he was discriminated against based on his

race.  Def.'s Mem. at 15.

In opposition, the plaintiff contends that his supervisors' proffered reasons for denying him cash awards "are untrue, dishonest, and/or dissembling." Pl.'s Opp'n at 30. First, he challenges the defendant's reliance on Mr. Boardman's criticism of his work as "highly subjective and style-based, without clear instances of poor work product quality." Id. at 31. Second, he questions Mr. Scharf's evaluation of his work on the <u>Bland</u> case, arguing that "none of [the problems] appear[ed] serious or were claimed to have damaged a case or a client," nor "objectively warranted a rewrite [of the memorandum] at all." Id.

On this score, the plaintiff has not met his burden of demonstrating an inference of discrimination. Although the plaintiff attempts to challenge his supervisors' criticism of him as overly subjective, he does not rebut the defendant's assertion that Messrs. Boardman and Scharf honestly believed that the plaintiff's work was deficient at the time. See Fishbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (stressing that the salient issue is not whether the employer's reasons were true or false, but whether it honestly believed the reasons when taking the personnel action). Further, Messrs. Boardman and Scharf's evaluation of the plaintiff is supported by other Postal Service managers. Mr. Calamoneri, the plaintiff's direct supervisor in the <u>Bland</u> matter, whose testimony he has not refuted, has stated that the plaintiff's analytical memorandum in <u>Bland</u> was "stilted and not well organized," and that "he needs to be directed to push a case along." Def.'s Mem. (Calamoneri Decl.) ¶ 11. Additionally, John Dockins, the Postal Service Contract Administration Manager, testified that he was "not impressed by [the plaintiff's] performance" on the Sunday premium case in 2006. Id. (Declaration of John Dockins) ¶ 4. Given this support for the defendant's appraisal of the plaintiff's work product, it is not this Court's role to act as a "super-personnel department that reexamines an entity's business decisions" and independently evaluate the quality of the

plaintiff's work product.  Holcomb, 433 F.3d at 897 (citation omitted).  Although the plaintiff's efforts may not have "damaged a case or client," Pl.'s Opp'n at 31, he admits that his work may have been tardy, id., Ex. 4 (Manuel Dep.) at 160, 171, and that Mr. Boardman "made substantial revisions" to his brief prepared in the Sunday premium case.  Def.'s Stmt. ¶ 62.  Notably, the plaintiff offers nothing outside of his own sworn statements which supports that he was deserving of a cash bonus or was unfairly denied recognition in 2006.  See generally Pl.'s Opp'n; see Carney v. Am. Univ., 960 F. Supp. 436, 439 (D.D.C. 1997) ("[N]either the nonmovant's conjecture and surmise nor mere 'conclusory allegations of discrimination, without more' are sufficient to defeat a motion for summary judgment.").  As a result, the defendant is entitled to summary judgment on the components of the plaintiff's discrimination claim regarding the alleged denial of cash awards after October 13, 2006.

    **b.**    **The Plaintiff's Negative 2005-2006 Performance Evaluation**

The plaintiff asserts that his receipt of a critical performance evaluation November 27, 2006, epitomizes his supervisors' overly subjective evaluation of his work.  Pl.'s Opp'n at 31. The defendant submits that the plaintiff received a negative 2005-2006 evaluation because his work product during the rating period was "deficient."  Def.'s Mem. at 37-38.  As support, the defendant offers Mr. Calamoneri's testimony regarding the plaintiff's work on the Bland matter, Mr. Dockins' testimony regarding the plaintiff's work on the Sunday premium case, and Mr. Rachel's declaration that he "had concerns about [the plaintiff's] performance [on the Sunday premium case]" and that he likely was the supervisor who told Mr. Boardman that the plaintiff was "still having trouble separating the wheat from the chaff."  Def.'s Mem. (Declaration of Kevin Rachel) at ¶¶ 5-6.  The defendant argues that these managers' estimation of the plaintiff's work substantiates Messrs. Boardman and Scharf's criticism memorialized in the performance

evaluation.  Def.'s Mem. at 38.  Further, the defendant highlights the plaintiff's 2004-2005 evaluation, which stated, inter alia, that he needed to improve his "organizational skills" and "written work products," and that he was "still fairly new to the practice of postal labor law," as being consistent with the 2005-2006 evaluation.  Def.'s Mem., Ex. T (Manuel 2004-2005 Evaluation) at 176-77.

In opposition, the plaintiff asserts that the defendant lacks "actual evidence" to support his proffered defense of the evaluation.  Pl.'s Opp'n at 32.  The plaintiff directs the Court to Garrett v. Hewlett-Packard Co., 305 F.3d 1210 (10th Cir. 2002), as what he contends was an analogous situation in which the defendant was found to have unfairly relied on subjective evaluations.  Id. at 1218.  Arguing that the performance evaluation is based on "a smattering of generalized subjective criticisms," the plaintiff disparages the defendant for not demonstrating objectively "why the other colleagues should have been ranked higher," Pl.'s Opp'n at 32, and concludes that the defendant's explanation is not sufficient "to disprove pretext," id. at 33.

Additionally, the plaintiff endeavors to "show[] that the employer's proffered explanation is unworthy of credence," Jones, 557 F.3d at 678, by identifying perceived discrepancies in Mr. Boardman's testimony and arguing that Mr. Boardman has a "proclivity to exaggerate the negatives about Mr. Manuel."  Pl.'s Opp'n at 34.  Moreover, he argues, the fact that some of Mr. Boardman's criticism is reflected in the plaintiff's 2004-2005 evaluation actually "raises a jury question of pretext" because Mr. Boardman may have inflated and exaggerated past criticism to justify the 2005-2006 evaluation.  Id. at 36.

In assessing the component of the plaintiff's discrimination claim regarding his performance evaluation, the Court must conclude that no reasonable jury could infer discrimination based on the defendant's actions.  To begin with, the facts of Garrett, 305 F.3d at

1210, are inapposite and not persuasive in this case.  In <u>Garrett</u>, the plaintiff, a computer engineer, had been a Hewlett-Packard employee for nearly twenty years and had received consistently positive evaluations over that period.  <u>Id.</u> at 1213.  After becoming an outspoken participant in the company's internal diversity program, the strength of the plaintiff's evaluations declined precipitously, to the point that he was rated in the lowest possible category.  <u>Id.</u> at 1214, 1220.  The company utilized a subjective evaluation system, whereby managers conferred and ranked all engineers "from best to worst."  <u>Id.</u> at 1217.  Because Mr. Garrett demonstrated that the company had not adequately explained its evaluation system and inconsistent treatment of him, the Tenth Circuit reversed the grant of summary judgment for the company.  <u>Id.</u> at 1220.  Mr. Manuel's case, however, is markedly different.  Unlike Mr. Garrett, the plaintiff can only compare his critical 2005-2006 evaluation to the prior two years, his first evaluations by Mr. Boardman.  Def.'s Stmt. ¶ 69.  Moreover, despite the negative tenor of the 2005-2006 evaluation, the plaintiff was not ranked in the lowest possible category ("Non-Contributor") as was Mr. Garrett.  <u>See</u> Def.'s Mem., Ex. S (Manuel 2005-2006 Evaluation) at 177.  Although the Postal Service's evaluation system is also subjective, the defendant garners credibility for it by appending the supporting declarations of Messrs. Calamoneri, Dockins, and Rachel, which contrary to the plaintiff's position do constitute "actual evidence."  <u>See</u> Pl.'s Opp'n at 32.  <u>Contra Garrett</u>, 305 F.3d at 1218 (noting that the defendant admitted that its evaluation system was "wholly subjective," which the plaintiff reinforced with expert opinion testimony).

Furthermore, the plaintiff's effort to discredit Mr. Boardman's testimony is unavailing.  The plaintiff has only shown that in his deposition Mr. Boardman gave at times incomplete responses and had limited memory of the incident when one of the plaintiff's co-workers made racially insensitive remarks (the Welles incident).  Pl.'s Opp'n at 34-36.  For example, when

asked about the plaintiff's work on the PI Plan, Mr. Boardman initially stated, "he never gave me the memorandum." Id., Ex. 1 (Boardman Dep.) at 164. When pressed, Mr. Boardman clarified, "[h]e gave me a three or four page, four or five page start to that." Id. at 165. Considering that the plaintiff admits not completing the PI Plan memorandum before his resignation, Def.'s Stmt. ¶ 78, nothing in the above exchange or any other offered by the plaintiff would lead a reasonable jury to believe that Mr. Boardman's testimony is unworthy of credence. See Jones, 557 F.3d at 678-679 (employee can create material dispute on ultimate issue of discrimination by demonstrating that employer's reason is unworthy of credence). Furthermore, given that Mr. Boardman gave his deposition testimony nearly four years after the Welles incident occurred, and the incident was resolved amicably, Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 30, Mr. Boardman's limited recollection of its details does not undermine his credibility or demonstrate pretext on behalf of the defendant.

Finally, in asserting that the defendant has failed to show why his colleagues were rated more favorably than him, the plaintiff has misstated the parties' respective burdens. The defendant has carried his burden of producing a legitimate, nondiscriminatory reason for its actions, shifting the burden to the plaintiff to demonstrate an inference of "discrimination vel non." Jones, 557 F.3d at 678. Without evidence to discredit the defendant's testimony, nor direct evidence that "a discriminatory reason more likely motivated the employer," id., this remaining component of the plaintiff's race and national origin disparate treatment claim also cannot survive the defendant's summary judgment motion.

## C. The Plaintiff's Retaliation Claim

The plaintiff also posits that the defendant retaliated against him after he engaged in protected activity by reporting the Welles incident. Compl. ¶ 11. Title VII's anti-retaliation

provision prohibits an employer from "discriminat[ing] against" an employee because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation."  42 U.S.C. § 2000e-3(a); see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  To establish a prima facie case of retaliation, the plaintiff must demonstrate that: "(1) []he engaged in statutorily protected activity"; (2) "the employer took an adverse personnel action"; and (3) "a causal connection existed between the two."  Pardo-Kronemann v. Jackson, 541 F. Supp. 2d 210, 214 (D.D.C. 2008) (quoting Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985)).  One means by which a plaintiff can demonstrate the requisite causal connection is by showing that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity."  Pardo-Kronemann, 541 F. Supp. 2d at 218 (quoting Holcomb, 433 F.3d 889, 903 (D.C. Cir. 2006)).  As with disparate treatment claims, the analytical framework set forth in Brady governs.  Jones, 557 F.3d at 678.

However, in the context of a retaliation claim, the Supreme Court has drawn a broader definition of adverse employment action from the text of Title VII, defining it as an action "that a reasonable employee would have found . . . materially adverse" and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68 (citation and quotation marks omitted).  In this sense, some actions not sufficiently adverse under a disparate treatment theory may sustain a retaliation claim.  See Powell v. Lockhart, 629 F. Supp. 2d 23, 42 (D.D.C. 2009) (finding for example, "[a] PI [Plan] that does not rise to the level of a materially adverse action for purposes of a disparate treatment claim may still satisfy this more liberal [retaliation] standard").

The defendant argues that the following actions alleged by the plaintiff are not materially adverse:  "(1) [the p]laintiff's alleged non-receipt of certain training opportunities; [and] (2) [his] removal from the Bland case."[12]  Def.'s Reply at 21 (citations omitted).  However, the defendant has not challenged the plaintiff's (1) non-receipt of cash awards after October 13, 2006; (2) receipt of a negative performance appraisal; and (3) the placement on a PI Plan as not amounting to adverse actions.  The Court agrees that the three above mentioned actions qualify as adverse under the governing law because given their connection to the plaintiff's wages, each "would have dissuaded a reasonable employee from making a charge of discrimination."  Burlington N., 548 U.S. at 68; see also Powell, 629 F. Supp. 2d at 42 (emphasizing the broader standard employed in retaliation cases).

With regard to the actions challenged as not being adverse, the defendant argues that even if analyzed together, the above actions "would not have dissuaded a reasonable employee from pursuing a charge of discrimination."  Def.'s Reply at 22.  The defendant emphasizes that the plaintiff "received all of the training he specifically requested," which was an amount "comparable to that received by his colleagues."  Id.  Additionally, the defendant notes that the plaintiff was removed from the Bland case "only after (and within days of) sending Mr. Boardman emails in which he complained about his workload," and "suggested that Mr. Boardman might talk to Mr. Scharf or Mr. Ellis 'about his working on the Bland ADR.'"  Id. (citation omitted).

In response, the plaintiff contends that when considered together, the above actions constitute a "pattern of antagonism" sufficient under Circuit precedent to sustain a retaliation claim.  Pl.'s Opp'n at 15.  The plaintiff explains that after reporting the Welles incident, he was

---

[12]  As noted in Section III.A, the plaintiff's claim regarding his non-receipt of four assignments before October 13, 2006, fails on exhaustion grounds.

removed from the Bland matter, received lower performance ratings, "his boss demeaned him by telling him to get special remedial training, i.e., a 'basic book on grammar' and weekly conferences to correct writing deficiencies," and forwarded his work to Mr. Scharf, which "manufactured support for the later PI [Plan] and the overt suggestion" that the plaintiff seek alternative employment.  Pl.'s Opp'n at 20 (citations omitted).

The Court concludes that the plaintiff's alleged non-receipt of training cannot be considered materially adverse, even crediting a pattern of antagonism.  The plaintiff's training hours exceeded the Postal Service's minimum requirement, and he has failed to identify opportunities wrongly denied to him with any specificity.  See Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 110-24; cf. Freedman v. MCI Telecomm. Corp., 255 F.3d 840, 845 (D.C. Cir. 2001) (noting that denial of training opportunities claim based on "'marginal distinctions with uncertain consequences'" failed to constitute an adverse employment action) (citation omitted).  Further, the plaintiff concedes that he was offered the "valuable" opportunity to attend the 2006 National Arbitrators Meeting but declined the invitation.  Pl.'s Opp'n, Ex.4 (Manuel Dep.) at 122-23.

However, the Court will consider the "pattern" alleged by the plaintiff to include his removal as first chair on the Bland case.  Even though the defendant has offered a neutral reason for the plaintiff's removal, by alleging that after Bland he was no longer offered federal court litigation, which was important to success at the Postal Service, the plaintiff has demonstrated material adversity.  See Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶ 8; Burlington N., 548 U.S. at 71 (noting that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case").  Therefore, the Court will assess the defendant's asserted non-discriminatory reasons and the plaintiff's rebuttal evidence for the following components of the retaliation claim that remain:  (1) the plaintiff's removal from the Bland case; (2) his denial

of cash awards after October 13, 2006; and (3) his receipt of a negative performance evaluation for 2005-2006 and subsequent placement on a PI Plan.

### a.     The Plaintiff's Removal from <u>Bland</u>

The plaintiff asserts that his removal from <u>Bland</u> "carries the earmarks of a discriminatory and retaliatory move that was unwarranted and damaged [his] career."  Pl.'s Opp'n at 22.  The defendant, on the other hand, argues that the plaintiff was removed from the case "to address concerns that he himself raised about his workload (not because of discrimination or retaliation)," and as support, offers the plaintiff's emails from October 20-23, 2006, in which he sought assistance with his demanding workload. Def.'s Reply at 8-9.

In opposition, the plaintiff denies vehemently that he sought to be relieved of "all involvement" in the <u>Bland</u> case.  Pl.'s Opp'n at 22.  He acknowledges, however, that he sent emails to Mr. Boardman detailing his workload concerns and identified the <u>Bland</u> ADR as one of these matters, but charges that "[t]he ADR portion was only a part of the whole case, but his supervisors took him off the entire <u>Bland</u> case."  <u>Id.</u>  He represents that as an attorney with fifteen years of federal court litigation experience who "knew much more about the case" than the "less experienced white male, Dennis Syzbala, who was assigned to take over the case," his removal "was akin to demotion."  Pl.'s Opp'n at 22-23.  In that vein, he asserts that before his removal he had "won a significant motion disposing of a key issue," and that he was the only Postal Service attorney sufficiently versed in the case to "engage in colloquy with the judge at the status conferences."  <u>Id.</u>

The Court must conclude that the plaintiff's proffered rebuttal evidence is insufficient to demonstrate an inference of retaliation.  Because the plaintiff acknowledges that he sent the above referenced emails to Mr. Boardman, and "indicated his temporary difficulty handling all

of his work and the Bland ADR all in the short time frame," Pl.'s Opp'n at 22, he cannot defeat the defendant's position that these emails provided a legitimate, nondiscriminatory reason for his removal from the case.  The plaintiff states, however, that "[a]t no time did [he] desire or ever tell Mr. Scharf or anyone else that [he] wanted to be removed from the Bland litigation," Pl.'s Opp'n, Ex. 16 (Manuel Decl.) ¶ 13.  Nonetheless, it is not evident that he ever clearly communicated this sentiment to his supervisors, and the plaintiff admits that his emails were "just giving my supervisor the options that he [had,]" without any clear indication of his preferences.  See Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 107.  Given the plaintiff's acknowledgement that he had presented his supervisor with options concerning how to address his dilemma, which left open the possibility that he would be removed from the Bland litigation, this Court is not "free to second-guess an employer's business judgment[.]"  Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

Moreover, the plaintiff's arguments concerning the nature of his removal are misleading in several respects.  First, although the plaintiff had fifteen years of federal court litigation experience, his replacement, then second chair attorney Mr. Syzbala, had eighteen years of civil litigation experience with a United States Attorney's Office.  Def.'s Reply (Deposition of Dennis Syzbala) ("Syzbala Dep.") at 34.  As the first chair attorney, it is likely that the plaintiff had greater knowledge about the Bland litigation; however, his assertion that he won a "significant motion" in the case is unsupported by the record.  See Pl.'s Opp'n at 23 (citing id., Ex. 4 (Manuel Dep.) at 95, which discusses winning a motion in the Stone case).  Second, despite the plaintiff's suggestion that removal from the "entire" Bland case was unwarranted, he has not identified any work other than the ADR that needed to be performed in the case at the time of his

removal.  See Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 107-08; Def.'s Reply (Syzbala Dep.) at 23-24,

27-28 (indicating that Bland had been confined to settlement discussions in 2006).

Finally, the Court must also note that the plaintiff's prima facie case of retaliation is

relatively weak.  See Jones, 557 F.3d at 678 (holding that courts may review prima facie

evidence toward ultimate issue of retaliation vel non).  Although the plaintiff establishes that he

"engaged in statutorily protected activity," and that "[his] employer took an adverse personnel

action" against him, Pardo-Kronemann, 541 F. Supp. 2d at 214, he does not clearly demonstrate

that "a causal connection existed between the two events," id., having been removed from the

Bland case on October 25, 2006, nearly two years after he engaged in the protected activity,

Def.'s Mem., Ex. P (Email from Boardman Oct. 25, 2006); see discussion supra n.2 (concluding

that the plaintiff reported the Welles incident in December, 2004).[13]  Although there exists no

"hard-and-fast rule" regarding the temporal proximity that must exist between protected activity

and the adverse action, Pardo-Kronemann, 541 F. Supp. 2d at 218, the connection must be "'very

close,'" Taylor v. Solis, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (quoting Clark County Sch. Dist.

v. Breeden, 532 U.S. 268, 273-74 (2001) (citing with approval cases in which a three and four

month period was found insufficient)); see, e.g., Hammond v. Chao, 383 F. Supp. 2d 47, 59

(D.D.C. 2005) (finding that a "year-and-a-half gap is too great to permit temporal proximity

alone to establish a causal connection"); Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003)

(finding a two-month gap insufficient).  And although the District of Columbia Circuit

recognizes that a "pattern of antagonism" can supplant temporal proximity, Taylor, 571 F.3d at

1323 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)), causation, or at

least a reasonable inference of causation must be demonstrated even when such a theory is

---

[13]  Although this December, 2004 date is disputed by the plaintiff, even using his proffered date of February 2005,
would likewise be too remote to demonstrate a causal connection.  See Taylor, 571 F.3d at 1322.

advanced.  See, e.g., Walker v. England, 590 F. Supp. 2d 113, 139-40 (D.D.C. 2008) (finding

that the plaintiff demonstrated a pattern of antagonism by showing a sufficient causal connection

between the protected activity and series of adverse actions).  While the plaintiff at times

characterizes the adverse actions he was allegedly subjected to as a "pattern of antagonism," Pl.'s

Opp'n at 20, he has not successfully advanced this theory.  For example, in Walker, 590 F. Supp.

2d at 140, the court determined that because the plaintiff "ha[d] an extensive history of EEO-

related activities" and his supervisors had been previously "excori[ated]" by the court, he had

satisfied the causal connection requirement despite a lack of close temporal proximity.  Id.  Here,

the plaintiff has not supplied similar circumstances based on inference through circumstantial

evidence or otherwise from which a causal relationship between his reporting of the Welles

incident in December, 2004 and the subsequent actions forming the basis of his complaint can be

inferred.  Nevertheless, based on Jones, the Court will conduct an analysis of the remaining

components of the plaintiff's retaliation claim.

### b.   The Plaintiff's Alleged Denial of Cash Awards

The plaintiff asserts that his denial of cash awards after February 4, 2005 demonstrates

"the retaliatory cascade effect" of his reporting the Welles incident.  Pl.'s Opp'n at 25.

Conversely, the defendant explains that "when [the p]laintiff did work that merited a cash award,

he received [one], and when his work was merely average or deficient, he did not."  Def.'s Reply

at 14.  As to this allegation, as with his disparate treatment claim, the plaintiff has not put forth

evidence which could lead a reasonable jury to infer retaliation.  See discussion supra section

III.B.a.

The plaintiff's only argument on this count is his supposition that all of the events

complained of "worked together as reasons to then deny Mr. Manuel bonuses."  Pl.'s Opp'n at

25.  As explained previously, the defendant's assessment of the plaintiff's performance in 2006

is supported by the sworn statement of several Postal Service managers.  Considering that the

bonuses complained of at the Postal Service were performance based and not rewarded routinely,

the plaintiff has simply not advanced sufficient evidence to challenge the defendant's legitimate,

nondiscriminatory reason for denying him awards after October 13, 2006.  See, e.g., Powell v.

Lockhart, 629 F. Supp. 2d 23, 44-45 (D.D.C. 2009) (noting that where the defendant offered

nondiscriminatory reasons for negative evaluation of the plaintiff, the subsequent denial of a

performance based bonus was not pretextual).

> **c.**    **The Plaintiff's Negative Performance Evaluation and Placement on a PI Plan**

The plaintiff asserts that for the year after he reported the Welles incident "he was ranked

lower than all of the other attorneys whom [Mr.] Boardman then supervised and rated."  Pl.'s

Opp'n at 19.  However, the defendant insists that the plaintiff's performance evaluation was

faithful to the quality of his work performance.  Def.'s Reply at 15.  The Court must again

conclude that on this component of his retaliation claim, the plaintiff has not met his burden.

Notably, this aspect of the plaintiff's retaliation claim is undermined significantly by the

timing of his performance evaluations.  The year after the plaintiff reported the Welles incident,

Mr. Boardman "rated [him] well and was favorably impressed with his work."  Pl.'s Opp'n at 19.

Even assuming arguendo that the plaintiff reported Mr. Welles' comments in February 2005 and

not December 2004 as concluded by the Court, this 2004-2005 evaluation clearly preceded the

more negative 2005-2006 one cited herein.  See Def.'s Mem., Ex. T (Manuel Evaluation 2004-

2005) at 173 (indicating rating period "end date" Sept. 30, 2005).  Therefore, in regards to his

2005-2006 evaluation, the plaintiff has not placed this evaluation in the "sequence of adverse

actions thwarting his career," Pl.'s Opp'n at 25, as it was nearly two years removed from his

protected activity when he received the amplified criticism and a subsequent drop in his numeric

rating.  Def.'s Mem., Ex. S (Manuel Evaluation 2005-2006).

In a further attempt to discredit his supervisors' placement of him on the PI Plan, the

plaintiff suggests that Mr. Boardman's criticism of his writing was pretextual.  The plaintiff

points to "minor but noticeable grammar, syntax and usage problems" in Mr. Boardman's PI

Plan memorandum as undermining his credibility as an evaluator.  Pl.'s Opp'n at 26.  However,

the suggested comparison between the PI Plan memorandum and the plaintiff's submitted work

product is unpersuasive.  The plaintiff has testified that, "[Mr. Boardman] loves to write, he's a

good writer," Pl.'s Opp'n, Ex. 4 (Manuel Dep.) at 155, and concedes that "[Mr. Boardman] did

review everyone's briefs . . . when [he] came in [as Manager and] . . . all of a sudden every brief

and every major work product had to be approved by [him]."  Id. at 165.  Therefore, the

plaintiff's allegation that Mr. Boardman chiefly criticized his work because of a retaliatory

motive is contradicted by his own testimony that Mr. Boardman was a demanding editor of the

work product of all employees.

Moreover, any inference of retaliation is also weakened by the nature of the plaintiff's

protected activity.  As the defendant argues, the plaintiff reported inappropriate comments made

by Mr. Welles, an attorney outside of Messrs. Boardman and Scharf's supervision.  Def.'s Mem.

at 43.  Accordingly, as the defendant correctly opines, Messrs. Boardman and Scharf had "no

motive" to retaliate against the plaintiff.  Id.  To be sure, the defendant "cannot prove the

absolute lack of a motive," Pl.'s Opp'n at 27, but the plaintiff offers no evidence outside of his

own bald assertion that his supervisors possessed any retaliatory animus toward him.  Id.; see

Vickers v. Powell, 493 F.3d 186, 195-96 (D.C. Cir. 2007) (dismissing retaliation claim where no

evidence of retaliatory motive by supervisor existed); cf. Barbour v. Browner, 181 F.3d 1342,

1347 (D.C. Cir. 1999) (holding that judgment as a matter of law was appropriate because the

plaintiff "ha[d] nothing to buttress her evidence of pretext").

D. The Plaintiff's Constructive Discharge Claim

      To sustain a claim of constructive discharge, the plaintiff must establish that "(1)

intentional discrimination existed, (2) the employer deliberately made working conditions

intolerable, and (3) aggravating factors justified [the plaintiff's] conclusion that [he] had no

option but to end [his] employment."  Harris v. Wackenhut Services, Inc., 590 F. Supp. 2d 54, 80

(D.D.C. 2009) (citation omitted).  The Court must assess the plaintiff's claim from the

perspective of a reasonable employee, recognizing that constructive discharge does not occur

"when an employee leaves an unpleasant but objectively tolerable job because alternatives have

become more attractive, even if the employer's misbehavior creates the unpleasantness."  Taylor

v. FDIC, 132 F.3d 753, 766 (D.C. Cir. 1997).

      The defendant argues that he is entitled to summary judgment on this component of the

plaintiff's constructive discharge claim because without a viable discrimination or retaliation

claim, the plaintiff cannot satisfy the first prong of the constructive discharge analysis.  Def.'s

Mem. at 44.  Further, the defendant contends that  plaintiff "was subjected to nothing other than

reasonable working conditions," id., and his decision to resign "was his prerogative," id. at 45.

In response, the plaintiff first contends that he has made out viable claims of discrimination and

retaliation, and second that "[u]nder the retaliation cause of action (at least) are the many

subjective criticisms, denials of opportunities and promotions, reductions in responsibility, and

the heightened humiliating scrutiny," that would constitute "aggravating factors."  Pl.'s Opp'n at

39.  And describing the PI Plan as "the last major pressure event in the sequence of retaliation,"

the plaintiff argues that at that point, he was in a "no-win" situation which compelled him to resign rather than fail the PI Plan. Id. at 40. The Court must disagree.

Having determined that the defendant is entitled to summary judgment on the plaintiff's underlying discrimination and retaliation claims, his constructive discharge claim consequently also fails. See Harris, 590 F. Supp. 2d at 80. Regardless, even assuming that the plaintiff could sustain either his discrimination or retaliation claim, he clearly cannot show that his "working conditions bec[ame] so intolerable that a reasonable person in [his] position would have felt compelled to resign [.]" Penn. State Police v. Suders, 542 U.S. 129, 141 (2004) (citation omitted). As the District of Columbia Circuit has explained, aggravating factors "are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the employee from seeking remediation on the job." Veitch v. England, 471 F.3d 124, 130 (D.C. Cir. 2006) (citation omitted). What the plaintiff experienced falls far short of this mark. And, even though the plaintiff contends that the final straw was not being given the necessary materials to complete the PI Plan satisfactorily, he admits that the defendant granted him several extensions to complete it. Def.'s Stmt. ¶ 78. Further, the plaintiff's representation that the PI Plan engendered career threatening consequences is nothing other than pure speculation, as he accepted an administrative law judge position (which would seem to be a step above what he was doing at the Postal Service) before opting not to complete the PI Plan, receive his supervisors' assessment of how well he had done, and await how his career as a Postal Service employee would progress thereafter. Def.'s Stmt. ¶ 79; see Veitch, 471 F.3d at 131 (citing Singletary v. District of Columbia, 351 F.3d 519, 528-29 (D.C. Cir. 2003), where "the plaintiff had been forced to work in an unheated, unventilated storage room containing brooms and boxes of debris when more suitable office space was available" as a comparison of where

constructive discharge was demonstrated).  What occurred here hardly illustrates a situation from which a reasonable jury could find that the plaintiff "had no option but to end [his] employment."  Harris, 590 F. Supp. 2d at 80 (quoting Sisay v. Greyhound Lines, Inc., 34 F. Supp. 2d 59, 66 (D.D.C. 1998)).  Therefore, summary judgment must be awarded to the defendant on the plaintiff's constructive discharge claim.

## III. CONCLUSION

For all of the foregoing reasons, the defendant's motion for summary judgment must be granted in its entirety.

**SO ORDERED** this 17th day of February, 2010.[14]

REGGIE B. WALTON
United States District Judge

---

[14]  An Order will be entered contemporaneously with the Memorandum Opinion granting the defendant's motion for summary judgment and closing this case.